**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **ROBERT LEE MILLER, Jr.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. CIV-19-455-D** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF OKLAHOMA CITY,** | ) | **JURY TRIAL DEMANDED** |
| **JERRY FLOWERS, individually and** | ) | **ATTORNEY LIEN CLAIMED** |
| **in his official capacity as a police officer** | ) | |
| **for the City of Oklahoma City, DAVID** | ) | |
| **SHUPE, individually and in his official** | ) | |
| **capacity as a police officer for the City** | ) | |
| **of Oklahoma City,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT FOR DAMAGES**
**(Violation of Civil Rights – Federal Constitution, Intentional Torts, Negligence,
Violation of Civil Rights – Oklahoma Constitution)**

**PRELIMINARY STATEMENT**

1.  In September of 1986 an elderly woman, Anna Laura Fowler, was raped and murdered at her home in a central Oklahoma City neighborhood.  Then in January of 1987 another elderly woman, Zelma Cutler, was raped and murdered in the same Oklahoma City neighborhood.

2.  No eyewitness evidence or other direct evidence enabled an immediate solution to the cases.

3.  However, Oklahoma City police officers located a vulnerable and, on that day notably unstable, man who lived in the neighborhood and walked its streets.  They decided to fabricate a case against him, though he had no criminal record and had not been known to associate with either Ms. Fowler or Ms. Cutler.

4.  The man who was in their sights was Plaintiff Robert Lee Miller, Jr.  Mr. Miller was

1

and is innocent.

5.   After Mr. Miller had been convicted, and received two death sentences and was issued 725 years in prison sentences, DNA testing was conducted.  That DNA testing, and other surrounding analysis, showed the prior laboratory work of  Oklahoma City police chemist Joyce Gilchrist to be patently incorrect. The DNA testing excluded Mr. Miller as being the person who left semen and other biological evidence at the crime scenes.  DNA also identified the true killer, Ronald Lott.  Mr. Lott has been executed for the Fowler and Cutler murders.

6.   Despite the fact that Mr. Lott and Mr. Miller were not associates and the fact that no credible evidence existed implicating Mr. Miller, the authorities continued to insist, after the DNA results,  that Mr. Miller must have somehow acted in concert with Mr. Lott.  After it was clear Mr. Lott was the perpetrator and that there was no reason to believe Mr. Miller was implicated, amended informations were filed alleging that Mr. Lott and Mr. Miller acted in concert.  The most recent of the those charging documents was the fourth amended information, which was filed on November 14, 2000.  That charge, as to Mr. Miller, remained pending until May 19, 2017 when it was dismissed with prejudice by an Oklahoma County district judge.

7.   On March 5, 2019, an Oklahoma County district judge made a finding that there is prima facie evidence of Mr. Miller's innocence.

8.   Yet, Mr. Miller was incarcerated for more than nine years, including spending approximately seven years on Oklahoma's death row.   This wrongful incarceration, and the subsequent insistence on maintaining charges against an innocent man, was due to the tortious and unconstitutional conduct of the defendants and their associates and agents. That conduct is described in part below.

**Using Demons and Dreams to Interrogate and Then Mislead**

9.  On February 23, 1987, Defendants Flowers and Shupe, together with former Oklahoma City police officer Robert Woods, interrogated Mr. Miller for approximately twelve hours, even though they knew throughout the questioning that Mr. Miller was hallucinating, maintaining fantastical beliefs (including at various times believing he was the Lone Ranger, a United States marshal, and then an Indian warrior), and in purported communication with dead persons, including Mr. Miller's grandmother.

See Exhibit 1 – containing the first five pages of the 291-page transcript of the February 23, 1987 interrogation.  This excerpt establishes that early in the interaction, Mr. Miller was discussing spirits, spells, and conversation with the dead. The excerpt also shows that, early on, officers were encouraging Mr. Miller to mix the imaginary world with the facts of the case. On page four of Exhibit 1, Defendant Flowers, just after Mr. Miller reported having had a dream, stated: "Vision this in your mind now, recall this."  Later on the same page Defendant Flowers said:  "Use your powers."

10.  In addition to improperly encouraging Mr. Miller to dream, hallucinate, and talk to spirits, the officers improperly planted information in Mr. Miller's mind in an attempt to create the false impression that Mr. Miller knew something about the crime scenes and about how the women were killed.

11.  For example, even though Plaintiff Miller envisioned numerous possible items of clothing left at one of the crime scenes, Defendant Flowers suggested to Mr. Miller that Mr. Miller was aware of just underwear left at a crime scene.  Because underwear was in fact left at one house, officers, in conjunction with prosecutors, were involved in crafting a misleading

narrative that since Mr. Miller knew underwear was left at a crime scene, he had information only the true killer would know.

12.   Officers similarly crafted other misleading narratives regarding the extent of Mr. Miller's knowledge and de-emphasized the many facts Mr. Miller got wrong.  Mr. Miller inaccurately speculated the killer stole a number of items, including jewelry, a radio, and a television.  In fact, nothing was stolen at either of the crime scenes.  Mr. Miller, who was twenty-seven years of age at the time, inaccurately said that one of the ladies (whose age at the time of the offense was 83) was only slightly older than Mr. Miller. Mr. Miller described a ligature mark that did not exist, stab wounds that did not in fact occur, and stated, though this was incorrect, that a knife was left at one crime scene.

13.   To obtain the purportedly incriminatory information, Defendants Shupe and Flowers, together with Robert Woods, used coercive tactics, in addition to suggestive tactics.  Exhibit 2, an excerpt consisting of the last four pages of the questioning (pages 45-48 of the transcript of tape 6), shows that Defendant Flowers, who was acting with the support and encouragement of Defendant Shupe, was continuing to try to put words in Mr. Miller's mouth and badger him into confessing until near the end of the lengthy inquisition.  For example, Defendant Flowers, told Mr. Miller: "… I know Rob what happened out there that night, as well as you do." (page marked page 45 in Exhibit 2) and on the same page stated "... you and I know what happened there that night …"  Not succeeding in that approach, Defendant Flowers insisted that Mr. Miller needed to confess to be right with God:  ".. confess with our mouth and thou shall be saved." (Exhibit 2, p. 46)  After trying to tell Mr. Miller (falsely) that there was physical proof Mr. Miller was guilty ("you're the only person who has the right hair and the right blood, nobody else in

this whole world could have done it because .. but you, Rob, I'm a friend .. --  Exhibit 2,  p. 46),

Defendant Flowers returned to the coercive religious tactic.  After reporting to Mr. Miller that

Flowers knew Plaintiff Miller was guilty, Defendant Flowers stated: "I know, listen .. confess

with our mouth, confess with our mouth and thou shall be saved,  Jesus said that …" (Exhibit 2,

p. 47)

14.  Defendants Flowers and Shupe, acting in conjunction with Detective Woods, used

other bizarre, unreliable and coercive techniques, including purporting to cast out demons and

repeatedly calling on Mr. Miller to use psychic powers, sometimes to try to get him to arrive at

conclusions suggested by the interrogators.   At times, Mr. Miller was promised help and safety

if he would confess.

15.  Despite the prolonged and intense nature of the encounter with Mr. Miller, Mr.

Miller unwaveringly maintained his innocence.  He never stated he committed an offense. He

corrected detectives on a number of occasions when they said or insinuated he was guilty.

During the course of the one interrogation, Mr. Miller denied involvement in the homicides more

than a hundred times.

16.  However, getting Mr. Miller to speculate or dream or otherwise divine a few details

of the crime scenes and crime sites, was enough to convince a jury to send Mr. Miller to death

row.

17.  Although the jury was informed of the entire contents of the interrogation, no juror

could be sure if she or he digested all incriminatory portions of such a lengthy, rambling, and, at

times barely sensical, police-citizen encounter.  Therefore, not only the words put in Mr. Miller's

mouth, such as the idea to focus on underwear in particular as a clothing item left behind, but

also the police and prosecution spin on the events, was critical to the outcome of the case. At trial, the authorities emphasized the number of times Mr. Miller used the word "I," as if a person who were not confessing would never use that word. District Attorney Robert Macy seized on the underwear, literally, parading it in front of the jury and telling the jurors only the real killer would have known underwear was left behind.

**Claiming Physical Evidence Was Consistent With Mr. Miller, When Proper Analysis, Even Prior to the DNA Testing, Would Have Excluded Mr. Miller**

18. Semen and hair were recovered from the crime scenes and brought to Oklahoma City police chemist Joyce Gilchrist for analysis. Samples were taken from a number of men connected with the neighborhood in which Ms. Cutler and Ms. Fowler were killed. Ms. Gilchrist stated she analyzed the hair of twenty-four persons and compared those samples with hair from the crime scene. She analyzed the blood of twenty-three persons.

19. Curiously, Ronald Lott was the one person who, according to Ms. Gilchrist, had his hair analyzed, but not his blood.

20. Ms. Gilchrist reported to her superiors and to the prosecutor's office, and then testified at Mr. Miller's trial, that her forensic analysis included Robert Miller and, as to the hair, excluded Ronald Lott.

21. She was wrong in both regards. Later DNA analysis would show some crime scene hair to be a genetic match to Ronald Lott.

22. The blood would have been determined not to match Mr. Miller if Ms. Gilchrist had performed complete and accurate analysis of not just the blood type, but also the associated blood markers. If her work had been up to standard, she would have determined prior to trial that Mr. Miller could not have been the semen donor. She instead insinuated incriminatory

significance to her blood analysis, stating the general blood type matched and that an antigen consistent with Mr. Miller was present in the semen.

23.  Ms. Gilchrist also claimed that a hair from the crime scene was consistent with hair from a dog named "Bear"  -- a dog that Mr. Miller was known to take for walks in the neighborhood.

After the time of trial, further analysis showed Ms. Gilchrist's contention regarding the dog hair to be bogus.

24.  In addition, after Mr. Miller's trial, there were multiple rounds of DNA testing, first commissioned by the defense and later by the prosecution.  In all the various testing, Mr. Miller was consistently and always excluded as being a possible donor of any of the biological evidence.

25.  For a number of years prior to her work in Mr. Miller's case, Ms. Gilchrist's supervisors were permitting testimony that they knew was, at the very least, questionable, permitting laboratory practices which were substandard, failing to assure that evidence was managed properly, and omitting requirements that proficiency testing, and other quality controls were in place.

26.  The supervisors knowingly allowed an atmosphere in which exculpatory evidence was allowed to go unreported or undiscovered, and fraudulent and/or unreliable evidence was produced.

This was in spite of the fact that more capable police chemists, including some who performed at the Oklahoma State Bureau of Investigation the same type of work Ms. Gilchrist did at the police department, had warned Oklahoma City police supervisors well in advance of the Fowler and

Cutler homicides, that Ms. Gilchrist's work was substandard and unreliable.

27. Mr. Miller  was victimized both by unconstitutional investigatory techniques and unconstitutionally deficient laboratory work being utilized to implicate him and by constitutionally inadequate procedures being used to determine if there was exculpatory evidence.

28. Mr. Miller's conviction, his subsequent incarceration, and his subsequent subjection to criminal charges without just cause, were in violation of the Fourth, Fifth, and  Fourteenth Amendments of the federal constitution, were in violation of Oklahoma statutes, and were in violation of Article II, § 7 of the Oklahoma Constitution.  Well-established constitutional law had prohibited suppression of exculpatory evidence and manufacture of  inculpatory evidence prior to Mr. Miller's arrest, conviction, incarceration and attempted re-prosecution.  Well-established constitutional law, established prior to the time of this case arising, prohibited coerced inculpatory statements, bringing a case where probable cause is non-existent or fabricated, preying on the vulnerable to extract unreliable incriminating statements, and promising help and safety if a person would make incriminatory statements.

## **PROCEDURAL HISTORY**

29. The following are some of the notable dates in the progression of this case:

September 3, 1986  –  Ms. Fowler raped and murder in the course of a burglary at her home;

January 11, 1987  –  Similar rape and murder occurs at home of Ms. Cutler;

February 23, 1987   – Plaintiff Miller interrogated by Defendants Shupe and Flowers and Detective Woods;

February 26, 1987  -- Murder, rape, and burglary charges filed against Mr. Miller as to both the Cutler and Fowler incidents;

May 19, 1988  -- Plaintiff Miller convicted at jury trial of two counts of first-degree murder, two counts of first-degree rape, two counts of first-degree burglary, and one count of attempted first-degree burglary.  The sentence is death as to each of the murder charges.  Terms of imprisonment are for 283 years (Fowler rape), 20 years (Fowler burglary), 10 years (Fowler attempted burglary), 392 years (Cutler rape), and 20 years (Cutler burglary);

November 11, 1992  -- Brian Wraxall of Serological Research Institute issues report regarding his DNA testing.   He concludes that semen from the two crime scenes "could not have originated from Robert Miller …";

February 24, 1995 --  Oklahoma Court of Criminal Appeals issues "Order Granting Joint Application to Reverse Convictions."  The order states the parties' application was made as a result of DNA testing;

March 10, 1995  -- Oklahoma County district attorney's office files amended information charging Robert Miller and Ronald Lott jointly with the murders of Ms. Cutler and Ms. Fowler;

February 7, 1997  -- Honorable Larry Jones, Oklahoma County, rules evidence is insufficient to reprosecute Mr, Miller;

March 13, 1997  -- Honorable Karl Gray, Oklahoma County, overturns Judge Jones's decision and reinstates charges against Mr. Miller;

March 19, 1997  -- third amended information filed again charging Mr. Lott and Mr. Miller conjointly;

January 22, 1998 --  district attorney's office dismisses charges against Mr. Miller and

Mr. Miller – for the first time since the initial charges were filed -- is released from confinement;

January 18, 2000  --  Mr. Miller files, in the Western District of Oklahoma, civil rights complaint alleging "abridgement of the right to be free from false arrest, unreasonable and unlawful seizure, malicious prosecution, and vindictive prosecution, as well as deprivation of plaintiff's right to due process of law" (Prior complaint attached as Exhibit 3);

February 7, 2000 – Richard Smith, at the time litigation division head for the Oklahoma City municipal counselor's office and an agent of the City of Oklahoma City,  files, on behalf of Defendant Shupe, a motion to dismiss stating that the statute of limitations had expired on the illegal arrest portion of the case and that the malicious prosecution part of the case was not viable because the then-existing dismissal was not a dismissal with prejudice and thus was not a termination in favor of Mr. Miller (Motion attached as Exhibit 4);

March 9, 2000  --  Counsel for Mr. Miller, being convinced by Mr. Smith and other attorneys for defendants, that no part of the case is viable, move to voluntarily dismiss the civil rights lawsuit with prejudice;

March 22, 2000 – District Judge Robin Cauthron signs order dismissing the civil rights lawsuit with prejudice;

November 14, 2000  --  Oklahoma County district attorney's office files fourth amended information alleging that Mr. Lott committed the Cutler and Fowler homicides "aided and abetted by Mr. Miller";

January 18, 2002 – Following jury trial, judgments and sentences pronounced against Mr. Lott, finding him guilty of the homicides and imposing two death sentences;

December 10, 2013 --  Ronald Lott executed;

September 2, 2016  -- Mr. Miller files motion in Oklahoma County District Court, asking that the case pending against him be dismissed and that the Court make an innocence finding;

January 20, 2017 – Honorable Michele McElewee, Oklahoma County, issues order denying Mr. Miller's motion, stating she lacked jurisdiction to consider the case;

April 10, 2017  --  Supreme Court of Oklahoma reverses Judge McElwee: "We find that the District Court of Oklahoma County has jurisdiction and order that the Court address the issues raised by the two parties.  (Exhibit 5)

May 16, 2017  --  Court of Criminal Appeals rejects State of Oklahoma's position that the case against Mr. Miller ended in 1998 and grants Mr. Miller's petition for writ of mandamus. "Petitioner has met his burden. He has a clear right to have the charges against him adjudicated." (Exhibit 6);

May 19, 2017 – Oklahoma district attorney's office files motion to dismiss the case against Mr. Miller with prejudice and judge grants order on same day.  Issue of innocence not addressed in order. (Exhibit 7);

May 18, 2018  -- Mr. Miller files motion for determination of the innocence issue in his favor;

August 21, 2018  -  Judge McElwee conducts hearing on innocence motion, but fails to issue ruling before she leaves the bench in January of 2019;

January 28, 2019  --  Mr. Miller files renewed motion asking for order that prima facie case of innocence has been made;

March 5, 2019  --  Honorable Amy Palumbo, Oklahoma County,  issues order making

finding that there is prima facie evidence of innocence and directing that no further proceedings be held against Mr. Miller in the case. (Exhibit 8)

## JURISDICTION AND VENUE

30.   The acts and omissions which are the subject of this action occurred in the Western District of Oklahoma.

31.   Jurisdiction is conferred by 28 U.S.C.§ 1343, which provides for original jurisdiction of this Court in suits authorized by 42 U.S.C. § 1983, to redress the deprivation under color of state law, statute, ordinance, regulation, custom, or usage of any right, privilege or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens or all persons within the jurisdiction of the United States.

32.   Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law.  28 U.S.C. § 1367.

33.   Plaintiff's action for damages is authorized by:

(1)   42 U.S.C. § 1983 which provides for redress of the deprivation under color of any statute, ordinance, regulation, custom or usage of any state or territory of any rights, privileges, or immunities secured to all the citizens or persons within the jurisdiction of the United States;

(2)   The First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States;

(3)   Other causes of action, either under federal or state law, which are unknown to the Plaintiff at this time but may be ascertained by discovery and asserted at a later time;

(4)   42 U.S.C. § 1988, which authorizes Plaintiffs' application for attorney fees and provides that a court may award attorney fees as part of costs in any action or proceeding to

enforce a provision of 42 U.S.C. § 1983.

34. Venue is proper because undersigned counsel is informed and believes that all Defendants  reside in the Western District of Oklahoma and that all or a substantial part of the events giving rise to the causes of action occurred in the Western District of Oklahoma. Venue is proper under 28 U.S.C. § 1331.

## PARTIES

35.  Plaintiff  was a resident of the State of Oklahoma at the time he was questioned, arrested, tried and convicted and resides in Oklahoma County, within the Western District of Oklahoma.

36.  Defendant Jerry Flowers at all times relevant to this complaint was a police officer in the employ of the City of Oklahoma City. He is sued in his individual and official capacities.

37.  Defendant David Shupe was at all times material to this complaint a police officer in the employ of the City of Oklahoma City.   He is sued in her individual and official capacities.

38.  Defendant City of Oklahoma City is, and was at all times mentioned in this complaint, a municipal corporation organized under the laws of the State of Oklahoma and is authorized to sue and be sued in its corporate name.

## FURTHER STATEMENT REGARDING TIMING

39.  Under Oklahoma law, a malicious prosecution cannot be maintained until the underlying proceedings have been dismissed with prejudice or otherwise come to a permanent end.  *Greenberg v. Wolfberg,*  1994 OK 147, 890 P.2d 895, 904 (Okla. 1994)(specifying that a dismissal without prejudice is not a favorable termination sufficient to permit a subsequent malicious prosecution action).  It was *Greenberg* that counsel for the city of Oklahoma City

13

cited, along with federal authority, in asserting that there had been no favorable termination at the time of the of the prior civil rights lawsuit.  Exhibit 4, p. 9.

40.  Favorable termination is determined with reference to state law and is an element of a section 1983 malicious prosecution action, as well as being an element of a state law malicious prosecution action.

41.  Consequently, since there was no favorable termination until the dismissal with prejudice in 2017, the two-year statute of limitations did not begin to run until the time of that May 19, 2017 motion and order.

42.  Regardless, Defendants are estopped, after claiming the case was premature when previously filed, from now claiming that an action could be obtained prior to a dismissal with prejudice. The other defendants, besides Defendant Shupe, also took the position that the malicious prosecution claim was not ripe.  For example, in the answer of  Flowers and Woods, it was claimed that the action was not viable pursuant to *Heck v. Humphrey,* 512 U.S.  477 (1994). A central holding of *Heck* is that a federal civil rights action under section 1983 cannot be maintained when it has the potential for conflicting with or implicating an underlying pending criminal case.

43.  Undersigned counsel is informed and believes that counsel for Defendants in the prior civil rights case suggested that, because of  the procedural timing barriers, the lawsuit could be considered frivolous if not voluntarily dismissed by counsel for Plaintiff.

44. A state law claim under the Oklahoma Tort Claims Act is not yet ripe, as a tort claim must preliminarily traverse the risk management process before a lawsuit can be filed.  Since the requisite prima facie innocence finding  occurred in March of 2019, subsequent steps toward a

lawsuit under the Tort Claims Act have not yet been fulfilled.  Mr. Miller anticipates moving to amend this lawsuit to include claims under the Oklahoma Tort Claims Act, once the risk management assessments have been made and risk management decisions rendered.

## THE LABORATORY

45.   The forensic errors and inept analysis in this case were  part of an egregious and unconstitutional pattern and practice on the part of the City of Oklahoma City, Ms. Gilchrist, and others in permitting and fostering the operation of a police laboratory where evidence was not stored properly, evidence was not analyzed and reported in accord with established scientific principles, meaningful proficiency testing was not occurring, quality controls were not in place, and obligations to the fair administration of justice were ignored.

46.   A departmental review board which was convened to evaluate Ms. Gilchrist's work made accurate findings that Ms. Gilchrist had mismanaged the laboratory, had behaved dishonestly, had mishandled evidence and case files, had made offensive remarks and writings, had failed to establish and follow proper laboratory procedures, had brought flawed forensic work to court, and  had arrived at conclusions which were not documented properly.

47.  This review occurred in 2001  – after Ms. Gilchrist had been engaging in these improper activities with the direct and/or tacit approval of the City of Oklahoma City and her supervisors for over 20 years.

48.   Defendant State of Oklahoma, through the Oklahoma County District Attorney's Office, and the City of Oklahoma City, through the police department, condoned Ms. Gilchrist's actions and ratified a long-standing tolerance and encouragement of her activities when leaders ridiculed and sought to discourage critical  reviews of Ms. Gilchrist's work from scientists and

member of the legal community.

49.   The police department and the district attorney's office condoned Ms. Gilchrist's faulty work by giving her performance awards when supervisors of both entities knew, and/or had reason to know, that she was overstating the value of some evidence, such as hair evidence, ignoring protocols, and producing results which were erroneous and/or unreliable.

**COUNT I**
**Claim Under 42 U.S.C. § 1983 for Malicious Prosecution, Use of Unreliable**
**and Faudulent Investigatory Techniques, Procurement of Unreliable**
**and Fabricated Evidence, Suppression of Exculpatory Evidence, Use of Coercive**
**Interrogation Techniques, Wrongful Conviction and Imprisonment**

50.   Plaintiff realleges and restates all the foregoing paragraphs and further shows and informs the Court:

51.   The illegal confinement, malicious prosecution, procurement of unreliable evidence, suppression of exculpatory evidence, and use of fraudulent investigatory techniques was brought about by Gilchrist, Shupe, Flowers, Macy, and Woods, in concert with other representatives of the City of Oklahoma City and representatives of the State of Oklahoma.  The actions were designed to prove a case against Mr. Miller, and to maintain the conviction once it was obtained, regardless of Mr. Miller's actual innocence or with reckless disregard to whether he was actually innocent.

52.   Despite publications and publicity – much of it occurring prior to the time of Mr. Miller's trial --  that false information could result from coercive interrogation and that the science of hair comparison was suspect, the City of Oklahoma City and its agents focused on these suspect forms of evidence and failed to take steps, such as conducting DNA tests, that could have made the result of Mr. Miller's case reliable.

53.   Mr. Miller was forced to remain incarcerated for some time after his innocence had been proved.

54.   The actions of Ms. Gilchrist and Mr. Shupe and Mr. Flowers and  other Oklahoma City police employees were pursuant to custom and practice of the City of Oklahoma City and were condoned by the Defendant supervisors.  In fact, Defendant Flowers, averred, in his answer to Mr. Miller's previous section 1983 lawsuit, that the questioning was "accepted" and "within the guidelines" of his training.  After the improper actions occurred in this case they were condoned and ratified and thus adopted as the actions of the City of Oklahoma City and of the State of Oklahoma.

55.   All the improper actions were in derogation of Mr. Miller's rights to due process of law and to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the federal constitution.  The incarceration which resulted was in contravention of the Eighth Amendment to the United States Constitution.

56.    The trampling of Mr. Miller's established constitutional rights caused Mr. Miller severe emotional distress, humiliation, loss of income, loss of property, pain and suffering and other damages for which he is entitled to monetary relief.

57.   The actions of Gilchrist, Flowers, Shupe, Macy, Woods and their associates were undertaken under color of state law and in the course of their official duties as government employees.

58.   Defendants' actions were deliberate, reckless, wanton and/or cruel, justifying the award of punitive damages.

59.   Count I is against each of the listed individual defendants in their individual and

official capacities and against the City of Oklahoma City. No punitive damages are sought against the City of Oklahoma City.

## COUNT II
### Claim Under 42 U.S.C. § 1983 for Conspiracy

60.  Plaintiff realleges and restates all the foregoing paragraphs and further shows and informs the Court:

61.  Gilchrist, Macy, Flowers, Shupe, and Woods, together with other investigatory, supervisory, and command personnel conspired to create a criminal justice operation where convictions could be obtained through questionable and/or fraudulent laboratory techniques, the suppression of exculpatory evidence, and the creation of unreliable evidence.

62.  These conspiracies deprived Mr. Miller  of his right to due process of law, his right to a fair trial, and his right not to be subjected to cruel and unusual punishment, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal constitution.

63.  The violations, under state law, of Mr. Miller's well-established constitutional rights caused him emotional distress, humiliation, loss of income, loss of property, pain and suffering and other damages for which is entitled to monetary relief.

64.   Because the conspiratorial actions were deliberate, reckless, wanton and/or cruel, punitive damages are justified.

65.  Count II is against each of the individual defendants, both of whom at all relevant times were acting under color of state law. They are sued in this count in both their individual and official capacities.

## COUNT III
**Section 1983 Claim Against City of Oklahoma City, a Municipal Government**

66.  Plaintiff realleges and restates the foregoing paragraphs and further shows and informs the Court:

67.  The City of Oklahoma City had in effect, both before and at the time of the events alleged in this complaint, policies, practices, customs, and procedures which operated to deprive Mr. Miller of his constitutional rights.

68.  Policies, practices, and procedures encouraged and condoned the suppression of exculpatory evidence, encouraged and condoned the creation of unreliable evidence, encouraged and fostered and condoned a notably shoddy police laboratory, and otherwise condoned or permitted activities injurious to the fair administration of justice.  It condoned, and in fact trained, investigators to obtain false and/or unreliable statements in interrogations, trained in the Reid method which includes trying to convince subjects to make inaccurate admissions under the guise of it being okay to admit to guilt under the version of events purveyed by investigators

69.     Among the unconstitutional policies and practices:

A.  a policy and practice and custom of failing to properly train and supervise officers in the techniques of reliably investigating serious crimes;

B.  a policy and practice and custom of failing to train personnel in the police laboratory and failing to maintain proper quality control or proficiency assurances;

C.  a policy and practice and custom of suppressing, destroying, or otherwise secreting exculpatory evidence;

D.   a policy, practice and custom of failing to discipline officers who violate the Constitution or otherwise transgress the rights of criminal suspects during their investigations;

19

E.  a policy, practice and custom of investigating crimes in a manner designed to prove a case against convenient suspects by procuring unreliable evidence and sometimes fabricating evidence without regard to whether innocent persons might be convicted in the process;

F.  a policy and practice of permitting psychological coercion in interrogations and a policy and practice of permitting and in fact training in the Reid method and other unreliable techniques which have and, at the time of Mr. Miller's questioning had, a history of producing false statements

70.  These interrelated policies and practices and customs, separately and together, were implemented to deprive possible targets of their constitutional rights, or at the very least were implemented with reckless indifference to the rights of possible targets of criminal investigations.

71.  The listed improper policies and procedures were a direct and proximate cause of the Constitutional violations, injuries, and damages set forth in Counts I and II of this Complaint. The policies and procedures were undertaken under color of state law.

## COUNT IV
### State Claim for Negligence Resulting in Wrongful Imprisonment

72.  Plaintiff realleges and restates the foregoing paragraphs and in addition shows and informs the Court:

73.  Defendants Shupe and Flowers, acting in conjunction with other investigatory personnel, and, in many instances pursuant to the policies and procedures endorsed by the City of Oklahoma City and State of  Oklahoma, provided evidence which was a key component in putting together an unreliable case against Mr. Miller.

74.  Defendants Shupe and Flowers owed a duty of care to Mr. Miller in their questioning

20

of him and in them formulating a case against him.

75.  Flowers and Shupe breached that duty of care.

76. To the extent Mr. Shupe and Mr. Flowers acted without regard to their training and without regard to police policies in conducting the improper interrogation, they may not be shielded by any state immunities.  The extent to which Mr. Flowers and Mr. Shupe acted outside the scope of their authority as city employees can only be determined through discovery.

77.  The negligence proximately resulted in Mr. Miller experiencing injuries, pain, suffering, fear, mental anguish, conviction, incarceration, humiliation, loss of money and property, loss of companionship and income.

78.  Because the Defendants' actions were reckless and wanton, Mr. Miller is entitled to punitive damages.

79.  This Count is against Defendants Shupe and Flowers only, in their individual and official capacities.

## COUNT VI
## CAUSE OF ACTION UNDER OKLAHOMA CONSTITUTION

80.   Plaintiff realleges and restates the foregoing paragraphs and further shows and informs the Court:

81.   This cause of action is against Defendants Shupe and Flowers only and only in their individual capacities.

82.  It arises because the manufacture of evidence, coercive questioning, and unreliable creation of  a case violate provisions of the Oklahoma Constitution.  *E.g.,*  Okla. Const. Art. II, §7, Okla Const., Art. II, §30.

83.  Although the *Bosh* line of authority has mostly been abrogated by subsequent

legislation, liability under the Oklahoma Constitution remains viable when only individual liability is implicated.  See *Barrios v. Haskell County Public Facilities Authority,*  2018 OK 90, 432 P.3d 233, 242-43(Edmondson, J. concurring).

## DAMAGES

84.    The actions of Defendants deprived Mr. Miller of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

85.  The unlawful and/or reckless and/or deliberate acts of Defendants inflicted severe emotional distress, caused Mr. Miller great humiliation, caused him pain and suffering, caused him loss of income and other monetary damages.

86.  Punitive damages are justified by the deliberate and/or reckless and/or wanton and.or cruel activities of the Defendants.

## PRAYER FOR RELIEF

87.   WHERFORE, premises considered, Plaintiff requests the following relief:

    a.  Compensatory damages in the amount of $50,000,000.00

    b.   Punitive damages in the amount of $45,000,000.00

    c.    Costs and attorney fees pursuant to 42 U.S.C. § 1988

    d.    Such other relief as the Court may deem just and proper

88.  A jury trial pursuant to the Seventh Amendment of the federal constitution, is demanded as to all claims.

Respectfully submitted,


/s/ Mark Barrett
MARK BARRETT, OBA # 557
P.O. Box 896
Norman, Oklahoma 73070
405-364-8367
barrettlawoffice@gmail.com
ATTORNEY FOR PLAINTIFF